[Civ. No. 18835. First Dist., Div. One. Oct. 20, 1960.]

DIMOND PUBLIC UTILITY DISTRICT, Respondent, **v.** RUTH SHAFFER, as Trustee, etc., et al., Appellants.

William A. Sullivan and Frank L. Magnani for Appellants.

Robert J. Dell'Ergo and James M. Paxton for Respondent.

BRAY, P. J.—Defendants appeal from a judgment in favor of plaintiff on its complaint and on defendants' cross-complaint.

### Questions Presented

1. Which Bayshore Voters League was in existence at the time of the deed to plaintiff?
2. Is plaintiff estopped to claim title against defendants?
3. Does the evidence support the finding that the deed of trust was void and do the findings support the judgment?

### Record

Plaintiff brought this action to quiet title to certain real property and the frame building thereon in Bayshore, San Mateo County. Defendants cross-complained, asking that the title to said property be quieted in Bayshore Voters League. The court found plaintiff to be the owner of said property and quieted plaintiff's title thereto.

In 1932 or 1933 a group of public-spirited citizens opposed to gambling in the area organized the "Bayshore Voters League," an unincorporated association. One of the organizers was defendant Claude Higgins. To provide a meeting place, the group raised some money and purchased the land. Title for the group was taken in the names of two of the

group, John P. Lawson and Rhoda Lawson, his wife. A building was erected on the property through donations of labor and materials. In 1933 the Lawsons deeded the property to "Bayshore Voters League Hall Corporation," a corporation. November 15, 1939, the corporation deeded the property to the unincorporated association, Bayshore Voters League. Lawson was president from the beginning until 1950. In 1936 Claude Higgins was expelled from the organization but returned after Lawson was no longer president. In 1951 the officers were James Throne, president; Bert Ford, vice president and chairman of the executive committee, and certain directors. Apparently there was no election of officers thereafter, the officers remaining the same, except that Throne and one of the directors, Parker, moved out of the area.

After 1951 Vice President Ford apparently sent out calls for meetings and phoned Higgins to attend, but no meetings were held until 1956, as Higgins had locked the building and refused the league use of the building. Higgins maintained the building and paid the utilities. In 1955 Higgins, without notice to the officers of the league, was appointed by court order trustee of the property. His trusteeship was terminated January 23, 1956. January 17, Higgins held a reorganization meeting, there being present five persons, including Higgins and his brother Lonnie. Claude was made president and an executive board elected. January 23 this group, plus Anna Higgins, Claude's wife, who was added to the executive board, purported to authorize the execution of a deed of trust to Higgins and his wife on the property to secure $2,400 which Higgins claimed to have advanced for taxes, repairs, etc. On May 29 Ruth Shaffer, Claude's daughter, was made secretary-treasurer. The only persons in this group who were members of the original league were Claude and Lonnie Higgins. Neither Vice President Bert Ford nor any of the other members of the original league were notified of the so-called reorganization meeting. On March 5, the Higgins group adopted "Bayshore Voters League Constitution and By-Laws." August 16, a meeting was called of the league of which Ford was vice president. At the meeting presided over by Vice President Ford there were present some 30 to 40 people. Resolutions were adopted authorizing the execution of a deed transferring the property to plaintiff. This deed thereafter was executed and delivered to plaintiff.

The court found in effect that the true Bayshore Voters League and the one which owned the property prior to its

conveyance to plaintiff was the one of which Ford was vice president and that Higgins never became president thereof, and that the Higgins' Bayshore Voters League never at any time had any interest in the property; that the deed of trust purported to be executed by the Higgins organization is void, but that Higgins is entitled to "retain the funds in his hands and payments heretofore made to him as total consideration for work and labor performed and moneys advanced, but is entitled to no lien on the premises for said work and labor or monies advanced." It appeared that Higgins had collected certain rentals and had appropriated certain bonds of the league. No accounting was made to show how much, if any, Higgins' expenditures for the benefit of the league, exceeded his collections.

1. *Which was the true Bayshore Voters League?*

 This is simply a factual case in which there is not much conflict in the testimony, although in some respects the testimony is vague as to the details of what happened over the years. The court resolved what conflict there was in favor of plaintiff and its findings are well supported by the evidence.

It is clear that this is a situation in which Higgins attempted to take over the league to the exclusion of its members. While apparently the league lay dormant from 1951 until 1956, such fact did not cause its members to lose their membership nor authorize Higgins to conduct a so-called reorganization meeting without notifying the members. The court was correct in holding that a meeting of five persons, only two of whom were members of the original association, could not constitute a reorganization of the league, nor could the property of the league be thereby transferred to Higgins' league. As the latter league had no interest in the former's property, the purported encumbrance thereof carried no title and was void.

This brings us to the questions raised concerning the transfer by the league which owned it, of the property to plaintiff. There is a conflict in the evidence regarding the notice given of the meeting of August 16, 1956, of the original Bayshore Voters League. Although Higgins denied receiving notice of the meeting, he was present but did not participate in the proceedings, nor did he object to any portion of the proceedings. The notice of the meeting was signed by five of the members of the original league and posted in

the meeting hall. The bylaws of the original league were not introduced in evidence, but there was testimony that they required notice of a special meeting to be signed by five members. The bylaws of the Higgins league are in evidence and plaintiff contends they were not followed. However, they have no application to the original league.

Plaintiff produced the resolution of the league and the deed. They were admitted without objection. They were regular on their faces. Section 1963, subdivision 20, Code of Civil Procedure, provides a presumption ''That the ordinary course of business has been followed.'' Defendants made no effort to overcome this presumption, and failed to show any irregularity in their issue, depending for irregularity upon their contentions (1) that the Higgins league was the true league and owner of the property, and that the resolution was not adopted by that league nor the deed executed by it, and (2) that plaintiff was a tenant of the Higgins league and therefore could not attack its title. As heretofore shown, there was no basis for the first contention.

2. *Plaintiff not estopped to assert title.*

As to the second contention, it appeared that on March 10, 1956, a lease of the premises was entered into between Bayshore Voters League as lessor (Higgins signing as president), and plaintiff as lessee. Plaintiff then moved into the premises and paid rent to Higgins from March to August.

There are certain exceptions to the rule that a tenant entrusted with possession by a landlord may not dispute the validity of the landlord's title unless he first restores possession to him. ▆▆ One of these exceptions is set forth in *Yuba River Sand Co.* v. *City of Marysville,* 78 Cal.App.2d 421, 425 [177 P.2d 642] : ''It is the established rule in California and in other jurisdictions that when a landlord not only seeks possession of real property, but also attempts to quiet title thereto as against the tenant, either by cross-complaint or otherwise, the tenant is not estopped from denying the landlord's title, but he may, under such circumstances, set up and establish any superior title which he may have acquired. [Citations.] In 32 American Jurisprudence, at page 128, the rule applicable to the situation in this case is concisely stated as follows:

'' 'Notwithstanding the general rule that a tenant in possession cannot maintain a suit against a landlord to litigate title, it has been held, in view of the rule stated above, that where, in such an action, the landlord files a cross complaint

asking that title be quieted in him, the tenant is not estopped from disputing that title and showing title in himself.' '' (See also 2 Witkin, Summary of California Law, § 239, p. 1068.)

3. *Findings.*

As heretofore shown the evidence fully substantiates the finding that Higgins' league did not own the property and hence the deed of trust purporting to create a lien thereon is void. Defendants' contention that the findings do not support the judgment is based on the fact that finding VI states that Claude Higgins ''is now, and has been, the duly elected president of an unincorporated association called the Bayshore Voters League. . . .'' Defendants reason from that statement and the facts that Higgins did not sign as president the deed to plaintiff but did sign as president the deed of trust to himself, that the judgment is not supported. However, defendants take that statement out of context with the other statements in that and other findings. There is an express finding that Higgins is not and never has been president of the league which deeded the property to plaintiff. Reading the findings as a whole it clearly appears that the court found (and the evidence supports it) that the league of which Higgins is president is an entirely different one than the league which owned the property.

Judgment affirmed.

Tobriner, J., and Duniway, J., concurred.